LUTHER MERRIAM, Administrator *de bonis non* of the estate of JAMES LEACH, *v.* JOHN B. BARTON, HEMAN B. ALLEN and SARAH, his wife, APOLLOS CUSHMAN and ANNA, his wife, BENJAMIN BARTON, —— CHAPIN and LUCY, his wife, ELIZA BARTON, CAROLINE BARTON, LUCY BARTON and WILLIAM BARTON.

Merriam
adm. of Leach
*v.*
Barton *et al.*

### *(In Chancery.)*

Though improvements are made upon lands mortgaged by a third person, claiming neither under the mortgagee nor mortgagor, yet, if after this the mortgagee enters and occupies, he may be charged for rents that arise by reason of such improvements.

The administrator is the person to bring a bill to redeem, instead of the heirs.

The equity of redemption is not barred by a possession in the mortgagee for a shorter period than fifteen years, though there may be an embarrassment in taking the accounts.

Exceptions to a master's report, addressed to the discretion of the chancellor, cannot be revised in this court, which sits as a court of error.

This court will not set aside the report of the master because the accounts were not verified upon the oath of the party, as specified in the 41st rule of chancery practice.

THIS was an appeal from a decree of the court of chancery that the defendants convey to the orator, as administrator of the estate of James Leach, deceased, certain lands mortgaged by the said Leach, in his lifetime, to William Barton, deceased, the defendants being the heirs and legal representatives of the said William Barton, deceased.

The orator, in his bill, set forth and charged, among other things, that James Leach, in his lifetime, to wit, on the 20th day of June, 1808, exected to William Barton, then in life, but since deceased, two promissory notes of that date, one for $107.65, payable on the first day of January, 1809, and the other for the same sum, payable on the first day of January, 1810, both on interest; that said Leach, afterwards, to wit, on the tenth day of January, 1809, executed a mortgage to said Barton of a parcel of land (describing it) being part of lot No. 7, in the second range, in the town of Barton, containing about one hundred acres, to secure the payment of said notes; that said Leach, in his lifetime, made

ORLEANS,
*March*,
1842.

Merriam
adm. of Leach
*v.*
Barton *et al.*

several payments to said Barton upon said notes; that after the death of said Leach, to wit, in the spring of 1828, the said Barton entered into the possession of the land so mortgaged and that he and his heirs and legal representatives had ever since been in the receipt and enjoyment of the rents and profits of said land; that the said Barton died some years since and that the defendants are the heirs and legal representatives of the said deceased, and praying that an account be taken of the rents and profits of said land and that the defendants be decreed to reconvey said land to the orator and for further relief.

The bill was filed at the March term of the supreme court, 1837.

The defendant, Allen, answered the bill, but the other defendants did not answer, and, as to them, the bill was taken as confessed. Allen, in his answer, admitted the execution of the mortgage deed and notes by James Leach to William Barton, deceased, as set forth in the orator's bill, but denied that the notes or any part thereof had been paid. He further admitted that he had been in the possession of the land since May, 1828, and had received the yearly rents thereof, amounting in all to eighty dollars. And he alleged that he had made permanent improvements upon the land; that, since the year 1816, the legislature had assessed five several taxes upon the land in question, amounting to twenty dollars, which was paid by the said Barton, the mortgagee, and by this defendant. He further alleged that on the 14th day of August, 1837, Isaiah Leach and Emily Smith, two of the children and heirs of the said James Leach, deceased, by their deed of quit claim, duly executed, acknowledged and recorded, conveyed said land to this defendant, and also all their interest in the said James Leach's personal estate; and he insisted that the notes described in said mortgage deed, and the interest thereon, after deducting the amount of rents received by this defendant, above set forth, were still due.

The answer was traversed, testimony taken, and, after argument, the bill was referred to a master, who subsequently reported as follows.

'The orator presented his account before the master,
'which consisted of the following items.

'To rents and profits on part of lot No. 7, from May 1st,

'1829, at $17.50 per year up to May, 1838, 9 years $157.50    ORLEANS,
'Interest on the above up to January 1st, 1841,         60.90      *March*,
'Three years rents and profits to May 1st, 1841,        60.00      1842.
'Interest,                                                2.80   Merriam
'1808, to payment on note,              $101.00          adm. of Leach
.'1809, to payment on note,              69.07                *v.*
'To one yoke of oxen.                                    Barton *et al.*

'In relation to the charge of $157.50, it was proved that
'John Kimball was the agent of William Barton, and as
'such agent leased said mortgaged premises, yearly, or other-
'wise, from the first of May, 1828, to the 1st of May, 1836,
'at from $15.00 to $20.00 per year, but for other pay than
'money; that the said William Barton died in 1831; that,
'in August, 1836, the said John Kimball settled with the
'defendant, Allen, who then appeared to be controlling the
'premises by reason of heirship, or otherwise, and such de-
'ductions were made for trouble by said Kimball and to re-
'munerate him for paying money that said Allen then
'received of said Kimball eighty dollars for the rents of said
'premises for eight years then past.

'I have, therefore, allowed for rents and profits up to the
'1st day of May, 1836,                                  $80.00
'Interest on same up to January 1st, 1841,              22.40
'For rents from May 1st, 1836 to May 1st, 1837,         20,00
'Interest on same to January 1st, 1841,                  4.40
'For rents on same from May 1st, 1837, to May 1st,
    '1838,                                               20.00
'Interest on same from May 1st to January 1st, 1841,     3.20
'For rents from May 1st, 1838, to May 1st, 1839,        24.00
'Interest on same to 1st January, 1841,                  2.16
'For rents from May 1st, 1839, to May 1st, 1840,        20.00
'Interest on same to May 1st, 1841,                         80
'For rent from May 1st, 1840, to May 1st, 1841,         20.00
                                                      ---------
'In the whole for rents and profits           $216.96

'In relation to the charges for rents the defendant offered
'to prove by witnesses, then present and summoned for that
'purpose, that nearly all the improvements made on said
'mortgaged premises, and out of which the rents and profits ac-
'crued, were made by other persons than the said James Leach,
'and had, by conveyance, become vested in the defendant.

Orleans,
March,
1842.

Merriam
adm. of Leach
v.
Barton et al.

'To the offer so made, the orator objected that the master 'could not receive any testimony not already taken and 'filed to be used in said cause. The objection was over-'ruled and the witnesses sworn and their testimony taken 'verbally.

'The defendant then proved by Alexander Benton, that 'said Benton's farm and said Leach lot, at the time Leach 'occupied it, lay side by side, and that, in 1817 or 1818, no 'person then being in possession of the Leach lot, Benton 'then went on to it, and cleared about eight acres thereon, 'and occupied the same, and also what was cleared by 'Leach, but claimed no right thereto or interest therein; 'that after occupying said lot about three years, Benton sold 'his own farm to one Silas Albee, and Albee went into pos-'session of it, but did nothing with said Albee about the 'Leach land and left said lot when he left the farm sold to 'Albee. It was also proved by Benton that Albee occupied 'the Leach lot after he left it.

'It was further proved, by Benton, that all the Leach lot, 'cleared and occupied by said Leach, excepting about four 'acres, was so covered up by the running away of Glover 'pond, in 1810, as to be unfit for cultivation, and that the 'rents and profits of said four acres was worth about four 'dollars a year.

'The defendant then offered in evidence a quit claim 'deed of said Leach lands from one Benjamin Wiggins to 'the said William Barton, dated October 7, 1828, and ac-'knowledged and recorded the same day, which said deed 'appears to have been given for the consideration of one 'dollar, and said Wiggins conveyed as administrator of Albee, 'but the deed does not recite any probate proceedings, be-'fore the sale and conveyance, nor did the defendant offer 'to prove that any were had, or that said Wiggins was ever 'the administrator of Allen. The deed was received by the 'master for the purpose of getting it before the court and is 'refered to, but it is not treated as any evidence, nor consid-'dered of any validity to convey the land.

'The orator further proved, by one Samuel Conant, that 'said Conant's father was the administrator of said James 'Leach, and that said Silas Albee made some kind of an 'agreement with him about the Leach land, and afterwards

ORLEANS,
March,
1842.

Merriam
adm. of Leach
v.
Barton et al.

'occupied the land, and that some kind of writing was 'made about the land, but does not recollect what it was. 'No written agreement between said Conant and Albee was 'given in evidence.

'The defendant then contended that the betterments 'made by Benton and Albee belonged to Benton, by virtue 'of the deed from Wiggins above mentioned, but the master 'adjudged otherwise, and has allowed the orator rents and 'profits for the whole improvements.

'If the court be opinion that the improvements made by 'Benton and Albee belonged to William Barton, they will al- 'low the orator for all rents and interest thereon, up to the 1st 'day of January, 1841, $52.28 and disallow the sum of '$216.96 allowed by the master.

'In relation to the charge of money paid on the notes, the 'master finds that on the 25th day of September, A. D. '1807, the said William Barton deeded to the said James 'Leach the lot of land in question, for the consideration (as 'shown by a certified copy of the record of said deed, and 'in no other way) of $300.00; that the deed was acknowl- 'edged at Danville, in Caledonia county, on the same day, 'and recorded in Barton the 20th day of January, 1809, ten 'days after the recording of the mortgage deed; but does 'not find that any other notes were given by said Leach to 'said Barton and dated June 20, 1808, as before mentioned; 'that after said notes were given, and, in the latter part of 'the year 1808, Leach paid into the hands of Jonathan 'Allyn of Barton, then the agent of said William Barton, '$101.00 in money towards paying for the land and that, in 'January, 1809, he paid into the hands of said Allyn $69.- '07, for the same purpose, and that the money so paid was 'placed by Allyn to Barton's credit, and that on the 12th day 'of October, 1809, the next October after the money was paid 'as above mentioned, Allyn settled his agency business with 'Barton, and those two sums were paid over by him to Bar- 'ton and by Barton applied on the notes against Leach. 'Neither the mortgage nor notes were produced, nor any ac- 'count given of them by the defendant, further than that he 'had made diligent search for them among the papers of 'said Barton, but could not find them, from which facts the 'master finds that the money was paid by Leach to be ap-

Orleans,
March,
1842.

Merriam
adm. of Leach
v.
Barton et al.

'plied on the mortgage notes and was so applied by Barton
'when he received it of Allyn, and therefore allows the same
'and the interest thereon up to the 1st day of January, 1841,
'amounting in the whole to $496.59, to which add $216.96
'allowed for rents, makes the whole sum allowed the orator
'by the master amount to $713.55.

'The defendant claimed to have the orator sworn to an-
'swer interrogatories in relation to his account, but he was
'not present and was not sworn.

'The admission of the copy of the deed from Barton to
'Leach was objected to by the orator, but the objection was
'overruled.

'The said Heman B. Allen presented his account, consist-
'ing of the following items;—

'Paid taxes of four cents per acre on wild lands from 1814
'to 1840,                                                $20.00
'Agency since Leach left the lot in 1813,                 54.00
'To paid John Kimball as charged in his account,
'rendered the heirs of said Barton,                        6.88
'To interest on the above $80.00, it being paid some
'10 or 15 years since, say averaging 12 years,           58.00
'To betterments on said lot, as it appears from the
'fact of the renting for more than they did
'formerly,                                               200,00
                                                         ————————
                                                         $338.88
'To amount of principal and interest of two pro-
'missory notes given by said James Leach to
'said Barton for $107.65 each, and dated June
'20, 1808, and payable the first day of January,
'1809, and 1st day of January, 1810, with in-
'terest,                                                1409.54

CONTRA CREDIT,

'By rent of ⅔ of ⅔ of lot No. 7, from 1828 to 1836,
'the widow having ⅓ and there being five child-
'ren, two of whom with the widow having con-
'veyed to Heman B. Allen by deed all their
'right, title and interest to said premises, as
'well for rents and profits as their right to real
'estate, eight years rent $10.00 per year for

'said lot, as appears by John Kimball's account

'rendered to the heirs of said Barton,    32.00

' By 2 two years' rents 1837 and 1838,    15.99

' By 1 year's rent 1839,    9.60

'In relation to the first charge of $20.00 for paying taxes, ' I find that in 1819, 1822 and 1825 each year the lot in ' question was sold to pay taxes at vendue and bid off by ' said William Barton and redeemed. That in 1824, the ' same lot was again sold to pay taxes and bid off by May ' and redeemed, but do not find who redeemed it; that in ' 1835, it was again offered for sale at vendue for taxes and ' bid down to 1-4 of an acre for the whole by John Kimball, ' and that said 1-4 of an acre was not redeemed and that ' said John Kimball quit claimed his right and interest to H. ' B. Allen. The whole charge is therefore disallowed.

' In relation to the next charge of $54.00 for agency on ' said lot since 1813, it was proved that Benton and Albee, ' and Albee's administrator, in succession, possessed and oc- ' cupied said land, from 1816 to 1828, without any under- ' standing with or interference or oversight of the said Bar- ' ton or his agent, and that, in 1828, said Barton took a quit ' claim deed of the land from Albee's administrator, and John ' Kimball took the oversight and charge of said lot from that ' time until August, 1836, at which time he settled with the ' said H. B. Allen, who then appeared to claim said premises ' in his own right, or in the right of said Barton's heirs, said ' Barton having died in 1831, and deducted pay for his ' trouble in taking care of said lot and paid said H. B. Allen, ' a ballance of $80.00 for rents received by him up to that ' time which $80.00 is allowed in the orator's account, the ' services of the agent having been settled at that time. The ' charge of $54.00 is disallowed.

' The next charge of $6.88 is disallowed for the following ' reasons : the charge is contained in the account of John ' Kimball, agent of said Barton, in 1836, and appears to have ' been made in September, 1827, and was for paying a bid ' on the land in question.

' It appears that a tax of four cents on the acre was as- ' sessed on the town of Barton in 1825, under which the ' land was sold by the collector and bid off by said Barton, ' and was redeemed from the bid. Believing that said Barton

ORLEANS,
March,
1842.

Merriam
adm. of Leach
v.
Barton et al.

ORLEANS,
March,
1842.

Merriam
adm. of Leach
v.
Barton *et al.*

'must have been paid by the redemption, the master has dis-
'allowed the charge. If the court are of opinion the charge
'should be allowed, they will allow it at $8.53.

'The next charge of $58.00 for interest is disallowed,
'because the charges making the principal are disallowed.

'In relation to the charge of $200.00 for betterments; it
'was proved by the testimony taken and filed in the cause
'that no betterments were made upon the premises by said
'Barton, but it was proved by the witnesses admitted to
'testify at the hearing before me, as before stated, that better-
'ments were made by said Benton, and Albee, who succeed-
'ed Benton in occupying the lot.

'I have disallowed the charge, but if the court be of opin-
'ion that the testimony of Benton and Kimball was properly
'admitted, and that the betterments belonged to said Barton,
'they will allow the charge at $100.00, which sum I find to
'be the value thereof. If the testimony was improperly
'admitted no betterments were proved and the charge must
'be disallowed.

'Neither the notes nor mortgage were produced at the
'hearing before me, nor was any account given of them
'other than that which is above set forth.

'If the court be of opinion that the notes be allowed in
'the account, I find that the notes and simple interest there-
'on will, on the 1st day of January, 1841, amount to the
'sum of $635.12.

'The defendant offered in evidence a copy of a deed from
'William Barton to James Leach, conveying the land in
'question, dated the 25th of September, 1807, acknowl-
'edged the same day and recorded the 20th of January,
'1809; also a copy of a deed from Sally Leach and Phebe
'Leach, Isaiah B. Leach, Lyman Potter, Elizabeth Potter,
'James Leach, Charles Smith and Emily Smith and Joshua
'Leach, widow and heirs of James Leach, deceased, dated
'the 4th day of June, 1830, and acknowledged the same
'day in the state of Pennsylvania, conveying said lot to John
'H. Kimball of Barton, which deed was recorded in Barton
'September 21, 1837.

'Also a copy of a record of a deed from Sally Leach,
'James Leach, Phebe Leach, Isaiah B. Leach, Charles Smith,
'Joshua Smith and Lyman Potter, widow and heirs of James

'Leach, deceased, dated the 9th day of April, 1830, and 'recorded in Barton, September 21, 1837, conveying said 'land to John H. Kimball.

'Also an original deed from Isaiah Leach, Charles Smith 'and Emily Smith, dated the 14th day of August, 1837, 'and recorded in Barton the 4th day of September, 1837, 'conveying all their interest in said land to defendant, H. B. 'Allen. All said deeds are quit claim deeds.

'The master, in stating the account, has not in any man-'ner treated the three last mentioned deeds as any evidence 'before him, nor consulted their effect upon the rights of the 'parties. The admission of them was objected to by the 'orator.'

On the coming in of this report, the defendant excepted thereto and prayed that it might be recommitted to the master for the following reasons among others.

1. Because the master reports that he finds a fact by presumption against the direct deed and acknowledgment of Leach, under his seal.

2. Because without evidence, but merely upon presumption, the master finds the mortgage notes paid or nearly so before the mortgage was executed.

3. Because the master allows rents and profits for improvements made by Benton and Albee, when the improvements were conveyed to the defendant by Albee's administrator.

4. Because the master allowed the several items of the orator's claim without their being verified by oath of the party, agreeably to the 41st rule in chancery.

5. Because the master has not allowed the account of H. B. Allen, and particularly of three-fifths of two-thirds of the rents and profits, a charge in his account, nor has he disallowed the same nor assigned any reason for not passing upon them, and reporting the facts in relation thereto.

6. Because the report is in other respects informal, uncertain, ambiguous, &c. But the chancellor refused to recommit the report.

*E. Paddock*, for orator.

We contend that as neither the notes nor mortgage were presented, nor the absence of them in any way explained, the legal presumption is that Leach, in his life time, paid off

ORLEANS,
March,
1842.

Merriam
adm. of Leach
v.
Barton et al.

the mortgage and cancelled both notes and deed; and the evidence is very conclusive to the point that such was the the case.

The master has clearly shown that all the defendant's charges, except the $200.00 for improvements, ought to be disallowed, and the $200.00 for improvements, sworn to in the answer, had not the shadow of truth to sustain it.

The legal fee of the land being in Leach, or his legal representatives, all improvements made thereon would enure to his benefit, by whomsoever made; therefore, Benton, having gone into possession without any color of right, must be viewed as a trespasser during his occupancy, and, had he injured the land, he would have been held liable to make good the damages. Benton conveyed nothing to Albee. His deed covers no part of lot No. 7, nor was it mentioned in the bargain as testified by Benton.

Albee's occupancy was altogether tortious, unless he had permission from Conant, administrator of Leach, as testified by Samuel Conant. What that agreement was we know not, and, from the presumption that it was a parol agrement, it never can be known. Whether he had permission from Conant to occupy or not, he had no interest, and could acquire no rights which could devolve on his administrator.

If, then, the Leach land was in no wise assets in the hands of Benjamin Wiggins, administrator of Silas Albee, Wiggins conveyed nothing to William Barton by his deed of the 7th of October, 1828, and it would seem Barton gave nothing for it. But if Barton acquired any interest in the land by the Wiggins deed, that interest enured to the benefit of Leach, his assignee, or his heirs, until Barton shall have foreclosed his mortgage against Leach or his heirs. This deed from Wiggins, however, without any license from the supreme court, or court of probate, affords another proof that the mortgage was paid off.

The 49th and 50th sections of the probate law (Slade's edition) recognize real estate as assets in the hands of the administrator for certain purposes, and therefore it is such until the estate is settled.

It is said that this administrator cannot support the present bill, because it does not appear that there are any claims

against the estate, and yet it is pretended by the defendants that the above notes are still due from Leach's estate.

The orator was legally appointed administrator *de bonis non* upon the estate of James Leach; and, until his letters of administration are legally recalled or vacated, he is invested with all the powers of an administrator, and it is begging the question to say that there are no debts to pay. And supposing there were none, the orator has a right, by the common rules of chancery, to maintain this suit, though he obtained his letters of administration by fraud, for *the title to sue* can only be tried on an appeal from the probate court, 12 Vesey, 298; 3 P. Wms. 370; 2 Swift, 219; and, until the question comes up in that shape, this court will presume that the probate court has done right. The orator having obtained probate, it is conclusive as to his title to sue. Again, the question of having the right to sue cannot be raised in this stage of the case; it can only be taken advantage of on a demurrer. 2 Swift, 219.

But our statute puts this question to rest. The 55th section (Slade's edition) makes it the administrator's duty to keep the fences in repair, and the 63d section expressly gives the right to any executor or administrator to maintain any action of trespass *quare clausum fregit*, or ejectment, or any other proper action, to recover the seizin or possession of any houses, lands, tenements, or hereditaments, or any damage done thereto. After this sweeping clause, it cannot be said, with a very good grace, that the present orator cannot maintain a bill to redeem and pay off a mortgage. It is a novel objection for a mortgagee to make that he will not receive his money; and the administrator's bond secures the community at large against his making a misapplication of the assets.

Again; if the present orator cannot maintain this bill, then it cannot be maintained at all; for the same 63d section of the statute bars the right of devisees and heirs from suing until the division of the estate; and, before a division, it would seem desirable to ascertain what there is to be divided.

*J. Cooper,* for defendants.

The questions presented are, first, can this orator be en-

ORLEANS,
March,
1842.

Merriam,
adm. of Leach
v.
Barton et al.

titled upon equitable principles to redeem the estate in question, and second, if entitled to redeem, is he entitled to an account? The defendants contend that both of these questions should be answered in the negative. The orator is not, upon equitable principles, entitled to redeem the estate, admitting the bill to be true. Fonblanc's Eq. 248–9, note s. *Blewell* v. *Thomas*, 2 Ves. Jr. 669. *St. Johns* v. *Turner*, 2 Vernon, 418. *Trask* v. *White*, 3 Bro. C. R. 289. *Demarest* v. *Wynkoop*, 3 Johns. Ch. R. 135–6. *Gibbs* v. *Baremore*, 5 Johns. C. R. 553. Fonb. B. 3, chap. 1, §6, p. 495. 1 Mad. 519–21. *Stewart* v. *Nichols*, 5 Cond. Eng. C. R. 405. *Shephard* v. *Murdock*, 12 do. 605. *Appleton* v. *Edson*, 8 Vt. R. 239. 1 Johns. C. R. 594. *Moore* v. *Cabel*, 1 Johns. Ch. R. 385.

There can be no right of redemption in this orator, unless it is expressly given by statute, because the estate was in Leach and vests in his heirs. They only can redeem. Suppose the defendant should foreclose, who should be defendant, and would this orator be a party? The heirs only have a right to redeem. *Solley* v. *Gower*, 2 Vernon's R. 61. 1 Knapp, 179. 1 Chitty's Eq. Dig. 699, 700–1.

To entitle this orator to redeem, there must be some statute regulations, otherwise he cannot redeem unless the estate is necessary to pay debts.

2. If the orator is entitled to redeem, still he is not entitled to an account against this defendant, for rents and profits, according to the prayer of the bill. The answer admits the execution of the mortgage, but denies all payments. The mortgage was made in 1809. Somewhere from 1810 to 1812, the mortgagor absconded. Can a payment be fairly presumed or claimed under such circumstances? *Stewart* v. *Nichols*, 5 Eng. Con. Ch. R. 407–8. The possession was vacated by the mortgagor in 1812 and continued so until 1816 or 1817, when Barton took possession.

The right to redeem rests in the heirs of Leach, if in any one, and as the defendant, Allen, shows, that he is the assignee of the heirs of Leach, and empowered to hold their interest, it presents this question; can an administrator call on heirs to advance money to reedeem an estate for his use unless he should first, by his bill, state, at least, that the interest of the creditors requires it. In order to do justice in this case and pass upon all the interests in the case, the court will pass

upon both the deeds from Leach's heirs, to wit, the one to ORLEANS,
Allen and the one to Kimball.  The court, by reference to    *March,*
                                                              1842.
these deeds, can regard this as no other than digging up a ————
stale claim, on Kimball's part, without equity, right or adm. of Leach,
                                                              *v.*
justice,                                                     Barton *et al.*

The opinion of the court was delivered by

BENNETT, J. —— It seems, by the report of the master, and
the facts stand admitted, that the notes were executed in
June, 1808, by James Leach to William Barton, the father
of the defendants, payable at the times stated in the bill, and
the mortgage in January, 1809 ; that John Kimball, being
the agent of William Barton, as such agent, leased the prem-
ises from the first of May, 1828, to the first of May, 1836,
and that William Barton died in May, 1831 ; and in August,
1836, Kimball settled these rents with Heman B. Allen, one
of the defendants, and paid to Allen, for rents received by
Kimball, eighty dollars.  The rents were allowed up to the
first of May, 1841, at $216.96.  It is said that the improve-
ments from which the rents accrued were not made by James
Leach, the mortgagor, and therefore the mortgagee should
not be charged with such rents.  It appears that in 1817 or
1818 one Alexander Benton entered upon the Leach lot,——no
one at that time being in possession,——and cleared about eight
acres and occupied that, and also what had been cleared by
Leach, but claimed no interest in the land ; and, after occu-
pying about three years, sold his farm to Albee, but not the
Leach lot ; and after this Albee occupied that lot.   Though
it would not be right to charge the mortgagee with rents
arising from his own improvements, yet Benton and Albee
were not in possession under the mortgagee, but in their own
wrong, and their improvements would enure to the benefit of
the mortgagor.   The administrator of Albee could convey
no right to them, because Albee, being a tort-feasor, had no
right to them in his life time, and the administrator did not
act by order of the probate court.

It is said that this bill cannot be maintained by the admin-
istrator of Leach.   In England, where the real estate, upon
the death of the intestate, passes directly to the heir, and is
not assets in the hands of the administrator for the payment
of debts, the bill should be brought by the heirs.   But, with

ORLEANS,
March,
1842.

Merriam,
adm. of Leach
v.
Baxter et al.

us, the law is different. The action of ejectment is given to the administrator, and the heirs cannot have the action until there has been a division of the estate, under a decree of the probate court, in cases where a division is necessary. It is the duty of the administrator to pay off the debts out of the personal estate, if sufficient for that purpose, and prepare the estate for distribution among the heirs. To discharge this duty he must, of necessity, be permitted to maintain a bill of this description, as the only means of ascertaining what may be due, if any thing, on the mortgage.

It is said that no account should be ordered after so great a lapse of time. By this I suppose is meant that, in this particular case, the equity of redemption is barred. In England an actual possession of twenty years is necessary in the mortgagee to bar the equity. In this state, it is true, fifteen years is sufficient. There is no ground for contending that Benton or Albee were in possession under William Barton, the mortgagee, so as to make their possession his. The master finds the reverse. This bill having been brought in 1837, the mortgagee's possession is limited to a little less than nine years before bringing the bill. Though there is, and will be, difficulty in taking the accounts in a case like this, yet, the bill should not, for this cause, be dismissed and the equity of redemption barred. The mortgagee had at all times the right of foreclosure, and if he suffers in taking the accounts, from lapse of time, he must impute it to his own negligence.

This court sits as a court of error to revise the final decree of the chancellor, and those exceptions to the report of the master, which are addressed to his discretion, cannot be revised in this court. Several of them are of this character, which need not be particularly noticed.

It may also be remarked that in taking the accounts the master, and not the court, is to settle the facts, and his finding is conclusive, unless the report, for good cause, shall be set aside. It is objected that the accounts before the master were not verified by the oath of the party, as required by the forty first rule of our chancery practice.

To give the right to examine a party before the master, upon common chancery principles, requires a special order to that effect, and the object of the rule was to dispense with

ORLEANS,<br>
March,<br>
1842.

the necessity of a special order, and did not contemplate a case of this kind. Besides, it can only be matter of discretion in the chancellor to recommit the report upon such an objection as this.

We do not think the decree of the chancellor precisely as it should be. All that the orator can claim is to have the mortgage cancelled. So much of the decree as directs a conveyance of the premises by the defendants to the orator must be reversed, and, in lieu thereof, it is ordered and decreed that the defendants, and all persons claiming under them, be perpetually enjoined from setting up, either at law or in chancery, any title or claim to the premises, under or by virtue of such mortgage deed. The case is remitted to the court of chancery, to be proceeded with accordingly.